870 F.2d 1499
 Terrence F. McCARTHY, as Guardian Ad Litem for Kyile
Thompson, a minor; Nancy Wayman and Dion
Thompson, individually, and John Doe,
husband and wife, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 87-3917.
 United States Court of Appeals,
Ninth Circuit.
 Argued June 10, 1988.
Submitted Dec. 30, 1988.
Decided March 28, 1989.
 
 Jeffrey Clair, Dept. of Justice, Washington, D.C., for defendant-appellant.
 Richard J. Kelley, Olympia, Wash., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, BRUNETTI and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 
 
 1
 We must determine the propriety of a damage award made pursuant to a claim under the Federal Tort Claims Act, 26 U.S.C. Sec. 2671, et seq. We affirm in part, reverse in part, and remand.
 
 BACKGROUND
 
 2
 Kyile Thompson was born at the Madigan Army Medical Center in Tacoma, Washington on September 12, 1983. Because of substandard treatment received during delivery, Kyile suffers from severe mixed spastic athetoid quadriparesis, microcephaly, severe developmental delay and seizure disorder. His natural mother, Nancy Wayman, instituted this medical malpractice action under the Federal Tort Claims Act for negligent treatment during birth. Kyile was eventually placed with adoptive parents. Terrence McCarthy was appointed his guardian ad litem. Kyile's natural father was not a party to the action.
 
 
 3
 The government conceded liability, and the claim was tried solely to determine the proper amount of damages. In this, the district court made the following awards: (1) $200,000 to Kyile for past pain and suffering, disability and disfigurement, (2) $2 million to Kyile for future pain and suffering, disability, disfigurement and lost capacity to lead a normal life, (3) $150,000 to Nancy Wayman for loss of love and companionship and destruction of the parent/child relationship, and (4) $4,288,290 to Kyile's guardian for economic losses.
 
 
 4
 The government appeals these awards, arguing they were excessive and insufficiently established.[1] The government also contends the present value of the award for future economic loss was incorrectly determined.
 
 DISCUSSION
 A. Standard of Review
 
 5
 We review FTCA damage awards for clear error. Shaw v. United States, 741 F.2d 1202, 1205 (9th Cir.1984). The award is clearly erroneous if, after a review of the record, we are "left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). To determine whether a given award is excessive, we look to the relevant state's case law on excessive awards. Id. The state of Washington considers awards excessive "only if the amount shocks the court's sense of justice or sound judgment" and if it "appears that the trial judge was swayed by passion or prejudice." Id. at 1209. To make this determination, we compare the challenged award to awards in similar cases in the same jurisdiction. Id. The choice of a discount rate, used to adjust to present value an award based on an income stream spread over time and adjusted for the effects of inflation, is reviewed for an abuse of discretion. Cf. Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 546-47, 103 S.Ct. 2541, 2555, 76 L.Ed.2d 768 (1983) (suggesting caution be used in determining a discount rate, given the uncertainties of future economic events).
 
 B. The Noneconomic Awards
 
 6
 The award to Kyile for noneconomic damages included $200,000 for past pain and suffering, disability and disfigurement, and $2 million for future pain and suffering, disability, disfigurement and lost capacity to lead a normal life. The government contends this damage award of $2.2 million is excessive.
 
 
 7
 Our evaluation of the $2.2 million award is controlled by two cases. The first is Shaw v. United States, 741 F.2d 1202 (9th Cir.1984), where we applied Washington damage award law in a case where an infant was injured during birth. While Scotty Shaw's injury was substantial, he was still capable of feeling and perceiving. In reviewing the record under the constraint of local law, we determined the district court's award of $5 million for pain, suffering, mental anguish, and loss of capacity was excessive and the inappropriate result of passion or prejudice. We therefore reduced this award to $1 million. Id. at 1209.
 
 
 8
 In Trevino v. United States, 804 F.2d 1512 (9th Cir.1986), we reduced a $2 million nonpecuniary award to an infant injured at birth to $1 million. Pursuant to the mandate of Shaw "to maintain some degree of uniformity" we based the reduction upon the comparable awards made in the state of Washington, our earlier decision in Shaw, and our review of the record which indicated the injured child would be able to attain a fourth grade educational level and engage in work during adult life. Id. at 1515.
 
 
 9
 Under our decisions in Shaw and Trevino, we conclude that the $2.2 million award to Kyile is excessive. Kyile's life expectancy is 40-60 years. While his injuries, like those of Scotty Shaw and Sophia Trevino, are grievous and his situation sympathetic, he is unaware of his diminished capacity. His physical condition has been stable. It appears that he did not suffer more pain in his first four years than he will in the future. The record also indicates that he can feel a range of emotion, respond to affection, smile, and interact with people. He also possesses a certain, albeit limited, degree of cognitive skills as demonstrated by his ability to operate a computerized "anti-aircraft" game. To maintain the required measure of uniformity with Shaw and Trevino, as well as to avoid a grossly disproportionate award, we find justice will be served by reducing the damage award for past pain and suffering to $100,000, and the award for future pain and suffering, disability, disfigurement, and lost capacity to lead a normal life to $1 million, for a total award of $1.1 million.
 
 
 10
 The rule by which this issue is decided was announced in this circuit in Shaw in 1984. In 1986 it was reaffirmed in Trevino. The record indicates in the present case that counsel for Kyile informed the trial judge with commendable candor and concern for his client that both Shaw and Trevino would require that the noneconomic damage award be limited to $1,000,000. In his brief and during oral argument, counsel for Kyile--who also represented Scotty Shaw--explained this decision as reflecting an attempt to avoid an appeal so that Kyile's severe needs could be addressed without delay. All of this notwithstanding, and for reasons that are obscure and inexplicable, the trial court (which is the same court reversed in both Shaw and Trevino ) went well beyond its prerogative and unnecessarily caused this litigation to become protracted. We note this regrettable situation in the hope it will not recur.
 
 C. The Economic Awards
 
 11
 An award of $4,288,290 was made to Kyile for recovery of total future economic losses purportedly reduced to present value. This includes $491,973 for after tax earnings, $2,545,330 for medical care and services, $272,002 for medical commodities, $68,383 for fringe benefits, and $910,601 for compensation for anticipated tax on interest earned on the award. The award according to the record should have been discounted to present value using a + 2% real rate of interest. This discount rate was apparently arrived at by using a 6.5% market rate of interest on three-year government securities and subtracting 4.5% for inflation.
 
 
 12
 The government first appeals the medical award, arguing that plaintiffs failed to establish the need for attendant care, augmentative communications equipment, and a computerized environmental control system. Even though the government concedes that the district court was presented in each category with a conflict in pertinent expert testimony, the government argues that plaintiff's evidence was deficient on its face and did not--and could not--justify to a reasonable medical certainty the district court's findings.
 
 
 13
 It is true that the government presented to the court an impressive group of qualified experts, each of whom generally substantiated the government's different view of Kyile's needs and potential. But, after reviewing the entire relevant record, we are not persuaded that the findings of the trial court in this regard were clearly erroneous. Plaintiffs did present to the court credible witnesses and evidence justifying the award. We cannot say that either the credentials or testimony of Dr. Vallarta, Certified Rehabilition Registered Nurse Kerrick, or Director Marriner were inherently defective. Together, their view of Kyile's future does provide a foundation for the award. In summary, we decline to retry the case.
 
 
 14
 The government complains bitterly in this connection that the trial court literally adopted plaintiffs' proffered findings of fact. We note parenthetically that it is difficult to accord much weight to this complaint in view of the government's failure to submit any of its own. It would have been most appropriate for the government to tender its view to the trial court rather than complain that the court worked only with the submission of its opponent. This is especially true in view of the government's complaints in its Reply to Appellee's Supplemental Brief on Calculation of Damages that the court failed to make certain important findings. Nevertheless, when we apply the "careful scrutiny" called for in Photo Electronics v. England, 581 F.2d 772, 777 (9th Cir.1978), it is not apparent that the trial court did not exercise its own judgment in this regard.
 
 
 15
 Second, the government argues that the trial court abused its discretion in rejecting its annuities-oriented approach to the case. Although we find no inherent defects in the government's proposals, we find no such problem in the trial court's basic approach either. However, we are persuaded that the government may be correct in its contention that the district court did not correctly apply the real rate of interest to determine the present value of the economic award. In Trevino, we recognized several alternative methods for determining the discount rate:
 
 
 16
 "1. Calculate the size of the lost income stream by excluding the effects of inflation and the 'real' interest rate by fixing the difference between the market rate of interest and the anticipated rate of inflation ...
 
 
 17
 2. Calculate the size of the lost income stream by including the effects of inflation and discounting by the market interest rate ...
 
 
 18
 3. Calculate the value of the pecuniary damages by employing a zero discount rate (the total offset approach)."
 
 
 19
 Trevino v. United States, 804 F.2d at 1519 (internal citations omitted). The choice of which method to employ is left to the trial judge, who must explain the choice he adopted. Shaw v. United States, 741 F.2d 1202, 1207 (9th Cir.1984). Once the trial judge chooses a discount rate, he must "apply it to each of the estimated annual installments, and then add up the discounted installments to compute the award." Id. (emphasis in original).
 
 
 20
 Apparently the district court employed the real interest rate approach in determining the present value of the pecuniary damage award. It calculated the real rate of interest by subtracting the rate of inflation (4.5%) which existed during 1953 through 1985 from the market rate of interest (6.5%) for the same time period.
 
 
 21
 In Trevino, we cautioned against the use of the unrepresentative time span from 1954 to 1984 which includes the aberrational years 1974 to 1982; years marked by recessions, double digit inflation, and extremes in oil prices. 804 F.2d at 1518. Estimates based on longer time spans diminish the effect of shorter aberrational periods. Id. The district court examined the period between 1926 and 1981 and rejected it because a 0% real rate of interest existed during that period. The district court also excluded the years 1974 through 1982 from the period of 1953 to 1985 but rejected this time span because the real rate of interest was less than 2%. In this case, the district court's use of the unrepresentative time span yielded a real rate of interest of 2%. A "trial court ... should [not] be reversed if it adopts a [real interest] rate between 1 and 3% and explains its choice." Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. at 548-49, 103 S.Ct. at 2556-57. Even though the district court used an unrepresentative time span, the discount rate falls within the 1 to 3% range set forth in Pfeifer; and accordingly we find no error in finding of fact No. 39, and we decline to disturb the district court's adopted discount rate.
 
 
 22
 Additionally, the parties stipulated to a "historical growth rate" of 6.25% per year for medical services, 3.75% per year for medical commodities, and 5.5% per year for earnings. It appears that the district court erroneously used the historical growth rate in addition to the real rate of interest as it found
 
 
 23
 By so stipulating [to these rates] the parties agreed that those figures could be utilized in their calculations of the pecuniary losses likely to be incurred by the minor plaintiff in the future. The parties agreed, however, that the stipulations were not to be interpreted as a binding projection of what the increases of wages and costs would actually be in the future.
 
 
 24
 Finding of Fact No. 37.
 
 
 25
 We note that the plaintiffs in their supplemental brief claim that the future economic losses found by the court in finding of fact No. 37 can be substantiated in the report of Dr. Bassett, the plaintiff's economist. If the court has adopted Dr. Bassett's report and his method of computing the present value, it has failed to make such a finding sufficient for us to review.
 
 
 26
 In computing lost earnings, the district court may not normally use the historical increases in wages to adjust the lost stream of income. As we pointed out in Trevino, "the growth rate of wages includes a component attributable to pay increases due to increased education, age and maturity, and increases in productivity, as well as a component attributable to inflation, the difference between the interest rate ... and the rate of growth of wages understates the real interest rate by whatever proportion of the growth rate of wages is not attributable to inflation." Trevino v. United States, 804 F.2d at 1518 (emphasis in original).
 
 
 27
 The plaintiffs correctly point out, however, that for the wage portion of the award the lost stream of income can be adjusted if sufficient proof is offered to reflect the "influence of individualized factors (such as foreseeable promotions) and societal factors (such as foreseeable productivity growth within the worker's industry)." Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 536, 103 S.Ct. 2541, 2550, 76 L.Ed.2d 768 (1983). In Trevino we agreed that a "plaintiff may be compensated for projected future increases in his wages due to increases in his productivity if he proves that he would have been likely to receive wage increases by reason of his increased productivity." Trevino v. United States, 804 F.2d at 1518 (emphasis added). Because Kyile has made no proof of individualized or societal factors, the district court erred if it increased the lost stream of income by the historical growth in wages.
 
 
 28
 As to the medical commodities and medical services portion of the award, the record discloses that Dr. Bassett and the government's consulting economist, John H. Taylor, relied on the consumer price index to determine the stipulated historical growth rates.
 
 
 29
 "[S]ince specific forecasts of future price inflation remain too unreliable to be useful in many cases," Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. at 548, 103 S.Ct. at 2556, there must be sufficient proof--including specific forecasts of the future rate of inflation based on appropriate time spans--to establish the historical growth in medical commodities and medical services. See id. at 536, 103 S.Ct. at 2550. In this case, the concerns expressed by Jones that the forecasts of future price inflation would be too unreliable and be costly and ultimately an unproductive waste of resources have been satisfied. Both parties' consulting economists made specific reports and calculations of the historical growth rate (price inflation) for medical commodities and medical services, and based upon these reports the parties stipulated to the historical growth rate of those items.
 
 
 30
 Accordingly, the stipulated historical growth rates were sufficient proof of the inflation rate for medical services and medical commodities, to allow the district court to increase the annual installments for medical commodities and medical services by this rate. If the district court used the historical growth rate, then it may not also use the real rate of interest option in calculating the discount rate. Rather the historical growth rate is used in the second option we identified in Trevino. Therefore, if the district court increases the annual installments (income stream) by the stipulated historical growth rate for medical commodities and medical services, it must discount that amount by the market interest rate. Trevino v. United States, 804 F.2d at 1519; Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. at 547-48, 103 S.Ct. at 2555-56.
 
 
 31
 In summary, absent proof of individualized and societal factors, the real interest rate is used to determine the present value of the wage award, and it is determined by subtracting the generic rate of inflation from the market rate of interest. If the stipulated historical growth rates are used to calculate the present value of medical services and medical commodities award, then the annual installments increased by the stipulated historical growth rates must be discounted by the market rate of interest. We reverse and remand for modification of the judgment after a recalculation of the present value of Kyile's economic award consistent with this opinion.
 
 
 32
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The $150,000 award to Nancy Wayman was initially appealed as excessive, but the government no longer contests this award. (Supplemental Brief of United States at 6)