Karen SCOTT and David Scott, husband and wife; and H. Frank Stubbs, as guardian ad litem for Johnathan Scott, Plaintiffs/appellees,

v.

UNITED STATES of America, Defendant/appellant.

Nos. 86–4017, 86–4112.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1988.

Decided Sept. 8, 1989.

William G. Cole, Dept. of Justice, Washington, D.C., for defendant/appellant.

Blair B. Burroughs, Carl A. Taylor Lopez and Jane I. Fantel of Lopez & Fantel, Mills & Cogan, Seattle, Wash., for plaintiffs/appellees.

Before BROWNING, WALLACE and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

This is a medical malpractice action brought by Karen and David Scott on behalf of themselves and their son Johnathan for injury sustained to Johnathan Scott during his birth at a military hospital. The action is based on the Federal Tort Claims Act (FTCA). 28 U.S.C. § 1346(b). A bench trial was held to determine liability and damages to be awarded.

## I

### BACKGROUND

Johnathan Scott is a severely deformed individual. He was born at the Elmendorf Air Force Base Hospital in Anchorage, Alaska to his mother, Karen Scott, on February 27, 1982. The district court found that the military medical personnel were negligent in their treatment of Johnathan prior to and during delivery, and that because of their negligent treatment he suffers from spastic quadriplegia, a form of cerebral palsy.

The district court also found that because of the spastic quadriplegia Johnathan has abnormal speech and eye movements. He will not walk and will be wheelchair bound, is social and aware of his environment, will not have sufficient intelligible speech to rely on that method of communication and will need computer assisted non-vocal communication. He will never fully feed himself and will not be able to independently care for himself. Johnathan is capable of feeling pain and can perceive the fact that he is disabled.

In light of these findings, the court awarded Johnathan $8,751,212 for future economic losses reduced to present value. This award was to provide for loss of future income, lifetime attendant care and medical services, medications, supplies and special equipment. Johnathan was also awarded $1 million for past and future pain and suffering, and $1 million for past and future physical impairment. Karen and David Scott were awarded $350,000 for loss of companionship of their child and for destruction of the parent-child relationship.

The government appeals the awards, contending that both the noneconomic damages and the economic damages awarded to Johnathan were excessive, that awarding noneconomic damages to the parents was error, and that the present value calculation is incorrect.

## II

## DISCUSSION

A. *Noneconomic damage award to the parents.*

Karen and David Scott's award for the loss of love and companionship of Johnathan and for the injury to the parent-child relationship was $300,000 and $50,000 respectively. Neither statute nor court decision in Alaska provides for such an award, although none denies it. Accordingly, in determining whether Alaska law would allow a parent to recover for loss of parent-child relationship, "the district court must make a reasonable determination, based upon such recognized sources as statutes, treatises, restatements and published opinions, as to the result that the highest state court would reach if it were deciding the case." *Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). We review the district court's determination that parental recovery for loss of the parent-child relationship would be permitted under Alaska law de novo. *Id.* at 1020.

The government argues that this court, in *Early v. United States*, 474 F.2d 756 (9th Cir.1973), rejected a common law claim

by children under Alaska law for the loss of a parent's society. Therefore, the claim for damages by the parents for injury to the parent-child relationship in this case should be rejected.

In *Hibpshman v. Prudhoe Bay Supply, Inc.*, the Alaska Supreme Court declined to follow though not expressly our holding in *Early* and recognized an independent cause of action for minor children for loss of parental consortium resulting from injuries tortiously inflicted on their parents by third persons. 734 P.2d 991, 994–95 (Alaska 1987). According to the *Hibpshman* court, this result was foreshadowed in part by its prior decision in *Schreiner v. Fruit*, 519 P.2d 462, 465–66 (Alaska 1974), which held that a wife or husband has a right to sue for loss of consortium caused by negligently inflicted injury to his or her spouse, and by the Alaska wrongful death statute, which authorizes recovery for loss of consortium when a parent or child dies. *Hibpshman v. Prudhoe*, 734 P.2d at 993–94; Alaska Stat. 09.55.580(c)(4) (1988). The *Hibpshman* court found that the claim for loss of parental consortium by a minor child was indistinguishable from either spousal consortium claims in injury cases or children's consortium claims in death cases, and rejected the arguments that damage to the parent-child relationship is intangible, difficult to measure, and imposes a threat of doubled recovery. The "calculation of damages for a child's loss of parental consortium [is no] more speculative or difficult than that necessary in other consortium, wrongful death, emotional distress, or pain and suffering actions." *Hibpshman*, 734 P.2d at 996.

Even though we did not recognize a common law claim for minor children in *Early*, following Alaska law and based on the reasoning of the *Hibpshman* case, the district court could reasonably have concluded that a parent's claim for damage to the parent-child relationship is not sufficiently distinguishable from spousal or children's consortium claims to warrant nonrecognition.

### B. *Physical impairment and pain and suffering damages.*

■ The district court awarded $1 million for Johnathan's past and future pain and suffering and $1 million for his past and future physical impairment. The government contends that physical impairment is not a traditional damage category under Alaska law and results in a duplicative award to Johnathan.

In *Patrick v. Sedwick*, 413 P.2d 169 (Alaska 1966), the Supreme Court of Alaska reviewed an award of $21,000 for past and future physical impairment and $10,500 for past and future mental suffering. In reviewing the amount of the damage award for error, the Supreme Court of Alaska did not consider the categories to be duplicative. *See Id.* at 172–73.

In *Early v. United States*, 474 F.2d at 758, we reviewed the amount of a damage award and did not find an award for pain and suffering and an award for loss of senses, loss of enjoyment of sex and psychotic conditions (physical impairment) to be duplicative. Accordingly, under Alaska law an award is not duplicative.

### C. *Nonpecuniary award.*

■ Under the law of Alaska, awards are excessive only if "it is so large as to strike us that it is manifestly unjust, such as being the result of passion or prejudice or a disregard of the evidence or rules of law." *Beaulieu v. Elliott*, 434 P.2d 665, 676 (Alaska 1967) (*Beaulieu*). The circumstances must indicate that the judge was swayed by passion or prejudice. *Id.*

The government contends that the district court's award of $2 million in noneconomic damages was excessive and inappropriate in light of our holdings in *Shaw v. United States*, 741 F.2d 1202 (9th Cir.1984), and *Trevino v. United States*, 804 F.2d 1512 (9th Cir.1986). Applying Washington law, this court in *Shaw* and *Trevino* found the nonpecuniary awards of $5 million and $2 million, respectively, to be excessive.

In *Trevino*, we found an award of $2 million to be excessive for a child, Sophia, who would be able to attain a fourth grade reading and writing level and who would be able to work during her adult life. 804 F.2d at 1515. Accordingly, we reduced Sophia's nonpecuniary award to $1 million.

Johnathan's injuries are dissimilar to Sophia's. Johnathan will not be able to work in his adult life. Sophia was able to walk unassisted and it was predicted that she would be able to function in a fairly independent manner. *Id.* at 1514. Johnathan has abnormal speech and eye movements and cannot walk. Johnathan will never be able to feed himself and will not be able to independently care for himself. Because Johnathan's injuries are more severe than Sophia's, the nonpecuniary award is not excessive.

To achieve uniformity, this court in *Shaw* referred to the highest reported verdict in a case of medical malpractice in the state of Washington, which was $1.1 million. 741 F.2d at 1209; *see Klink v. G.D. Searle & Co.*, 26 Wash.App. 951, 614 P.2d 701 (1980) (plaintiff awarded $1.1 million for doctor's negligence which caused plaintiff to suffer a massive stroke). The fact that Scotty Shaw's injuries did not leave him unconscious, unlike the plaintiff in *Klink,* led this court to conclude that the $5 million nonpecuniary award was excessive and to reduce it to $1 million.

The $5 million award in *Exxon Corp. v. Alvey* is evidence that the $2 million award to Johnathan is not excessive under Alaska law. 690 P.2d 733 (Alaska 1984). In *Exxon,* the plaintiff suffered substantial loss in the use of his legs. He also permanently lost control of his bowel and bladder. The *Exxon* decision does not specify how the award was allocated between pecuniary and nonpecuniary damages. The Alaska Supreme Court held that the "verdict, while large, does not seem so disproportionate to the injuries suffered by [the plaintiff] as to indicate passion and prejudice." *Id.* at 742. While not directly on point, the *Exxon* decision provides some guidance. Johnathan's injuries are more severe than the injuries described in *Exxon.* Under the constraints of local law and our holding in *Trevino,* the nonpecuniary award is not excessive.

D. *Economic award.*

■ The government contends that the district court's findings with respect to damages for attendant care are clearly erroneous because Johnathan should not receive full-time home attendant care. Rather, the government would have Johnathan's mother provide most of his care with the assistance of a home care helper for three hours per day for a five-day week during the school year and six hours per day in the summer time. The government's expert witness, Dr. West, suggested respite care on weekends, allowing Mrs. Scott two days away from her child each week. Upon reaching the age of 21 the government would have Johnathan live in an Intermediate Care Facility for the Mentally Retarded.

The appellees' expert, Ms. Keerick, a certified rehabilitation nurse, suggested that Johnathan be cared for by private attendants in a private residence. Specifically, Johnathan would have a live-in aid who would provide 14–16 hours of care every day of the year. This care would be decreased to 12 hours per day after Johnathan attained the age of 19.

These different care plans result in divergent cost estimates for future attendant care and medical services: the government's medical care experts estimated the cost at $1.4 million, and the appellees' experts estimated the cost at over $10 million.

According to the government, Mrs. Scott should continue to be the primary care provider and have the primary responsibility for the care of Johnathan. The government's testimony is that lifetime private nursing services would smother Johnathan and supplant the family as primary care giver.

Undisputed medical testimony proves that Johnathan will require 24 hour professional care for the remainder of his life. Although Johnathan's mother might theoretically be able to provide such care, it is not clear error for the district court to find in favor of lifetime attendant care.

Relying on *Trevino*, the government asserts that we should eliminate the award for lifetime attendant care entirely. In *Trevino*, the plaintiffs' expert witness was not well qualified to testify about developmentally disabled children. 804 F.2d at 1516. The conclusions reached by the plaintiffs' expert were "spotty at best" and "not well founded." *Id.* In contrast, the government's expert in *Trevino* was competent and testified that constant attendant care would be harmful. Accordingly, we found the district court's grant of attendant care wholly unsupported by the record and eliminated it. *Id.* at 1517.

In this case, both the government's expert and the appellees' expert were qualified to testify as to the future medical services and attendant care needs of Johnathan, and based on the disputed testimony the district court's award for attendant care and medical services is not clearly erroneous.

E. *Therapy available under the EAHCA.*

■ The government contends that the damages awarded by the district court should have been reduced to reflect the value of in-kind care and therapy Johnathan might obtain under the Education of All Handicapped Children Act (EAHCA). According to the government, the EAHCA programs are superior to home attendant care because of the normalization they provide.

By not reducing Johnathan's award, the government argues that they are being required to pay twice for the same injury. The gist of the government's argument is that by providing federal assistance to state programs for the handicapped, the United States should not have to pay in tort for the cost of a private program of care for Johnathan.

At trial, the government did not present any evidence of the value of services available to Johnathan under the EAHCA, and the district court was correct in rejecting any setoff for EAHCA benefits from the future medical services award.

F. *Present value calculation.*

■ "Damages to be awarded under the Federal Tort Claims Act (FTCA) are gov-

erned by the law of the place of the wrongful act, but are limited to compensatory damages." *DeLucca v. United States,* 670 F.2d 843, 844 (9th Cir.1982); 28 U.S.C. § 2674. "In Alaska ... [i]ncome taxes and inflation are not considered in awarding future lost wages ... nor are such awards reduced to present value." *Ehredt v. Dehavilland Aircraft Co. of Canada,* 705 P.2d 446, 452–53 (Alaska 1985) (citation omitted); *see Yukon Equipment v. Gordon,* 660 P.2d 428, 434 (Alaska 1983); *Beaulieu,* 434 P.2d at 671. In *Hollinger v. United States,* 651 F.2d 636, 642 (9th Cir. 1981), we noted that "even though the amount of damages to be awarded under the [FTCA] is governed by the law of the place of the wrongful act, if the local law provides for punitive damages, or permits application of standards which result in a plaintiff receiving more than compensatory damages, then only the compensatory damages may be awarded." *Id.* at 642. Accordingly, we held that if there is competent expert testimony, a district judge must compare

the result of the Alaska "offset" method with what the result would be if the inflation effect is considered and the award is reduced to present value.... If this "inflation-reduction" figure is so much lower than the Alaska "offset" figure that [the district judge] concludes the offset award would be punitive or result in excessive compensation rather than compensatory damages, then the "inflation-reduction" figure should be used. If the district judge is unable to arrive at reliable estimates of future inflation or interest rates, or if the "offset" figure is not punitive or does not impose excessive compensatory damages, then Alaska's "offset" method should be followed.

*Id.*

The district court erred in three respects. First, the district court did not determine the Alaska offset figure. Second, the district court erred in its calculation of the "inflation-reduction" figure. Third, the district judge erred in failing to determine whether the Alaska offset figure would be punitive. Because the Alaska offset figure has not been determined, we limit our discussion to the district court's error in its calculation of the "inflation-reduction" figure.

The district court's ruling in this case was decided before our decision in *Trevino.* Relying on *Trevino,* the government contends that the district court erroneously applied a −2% discount rate in determining the present value of future medical services and lost wages. We agree.

In *Trevino,* we recognized several alternative methods for determining the discount rate:

1. Calculate the lost income stream by excluding the effects of inflation and the 'real' interest rate by fixing the difference between the market rate of interest and the anticipated rate of inflation;

2. Calculate the size of the lost income stream by including the effects of inflation and discounting by the market interest rate;

3. Calculate the value of pecuniary damages by employing a zero discount rate (the total offset approach).

804 F.2d at 1519 (internal citations omitted).

In this case, the district court applied a set formula which assumes a constant relationship between inflation and interest rates.

The first step in determining the real rate of interest is to ascertain the market rate of interest. Dr. Bassett, the appellees' expert, testified that the market rate of interest for three year treasury bonds for a thirty year period (1954 to 1984) was 6.4%. The government's expert, Mr. Walsh, testified that the market rate of interest was 7%. The district court adopted Dr. Bassett's figure of 6.4%. Both experts agree that the rate of inflation for the period 1954 to 1984 is 4.5% and that the real interest rate is the difference between the market rate of interest and inflation, or 1.9%–2.0%. [Appellant's brief, p. 30, and appellees' brief, p. 37.] The " 'trial court ... should [not] be reversed if it adopts a [real interest] rate between 1 and 3%.' " *Trevino v. United States,* 804 F.2d at 1519 (quoting *Jones & Laughlin Steel Corp. v.*

*Pfeifer*, 462 U.S. 523, 548–49, 103 S.Ct. 2541, 2556–57, 76 L.Ed.2d 768 (1983)).

It would have been proper for the district court to apply the 1.9% rate to the lost income and medical care services portions of the award. *Id.* Instead the district court failed to detail its present value calculation in a manner sufficient for review, but merely adopted Dr. Bassett's calculations for the awards, which were erroneous. *See* Finding of Fact No. 78. The erroneous awards occurred as follows:

### 1. *Lost Wages*

■ With respect to lost wages, Dr. Bassett ascertained the average compensation for all private, nonagricultural employees in the United States for the thirty-year period from 1954 to 1984 increased at 6.3% per year. This historical increase in wages (6.3%) was subtracted from the market rate of interest (6.4%) yielding a pretax discount rate of .1%.

In *Trevino,* we found it improper for a district court to use the historical increase in wages as a measure of inflation for the purpose of calculating a discount rate to be applied to the wage portion of the award.

> Because the growth rate of wages includes a component attributable to pay increases due to increased education, age and maturity, and increases in productivity, as well as a component attributable to inflation, the difference between the [market] interest rate ... and the rate of growth of wages *understates* the real interest rate by whatever proportion of the growth rate of wages is not attributable to inflation.

804 F.2d at 1518 (quoting *Sauers v. Alaska Barge & Transp., Inc.,* 600 F.2d 238, 246 n. 15 (9th Cir.1979)) (emphasis in original).

The appellees point out that the lost stream of income can be adjusted for "real" wage inflation [appellees' brief, p. 33], but this is true only if sufficient proof is offered to reflect the "influence of individualized factors (such as foreseeable promotions) and societal factors (such as foreseeable productivity growth within the worker's industry)." *Pfeifer,* 462 U.S. at 536, 103 S.Ct. at 2550. In *Trevino,* we also

said that "[a] plaintiff may be compensated for projected future increases in his wages due to increases in his productivity *if he proves* that he would have been likely to receive wage increases by reason of his increased productivity." 804 F.2d at 1518–19 (emphasis added). Because Johnathan made no proof of individualized or societal factors, the district court erred when it used the historical increase in wages as a measure of inflation rather than the generic rate of inflation and the real rate of interest approach analysis for the purpose of calculating the discount rate for Johnathan's lost wage award. *See id.*

### 2. *Medical Care Services*

■ The district court used a similar approach with the medical care services portion of the award. The district court adopted Dr. Bassett's calculation of the historical growth rate (future inflation) for medical care services. According to Dr. Bassett's report, the Consumer Price Index was used to determine the historical increase in medical care services for the thirty year period 1954 to 1984. The historical rate of inflation for medical care services (6.7%) was subtracted from the market rate of interest (6.4%), yielding a pretax discount rate of 0%, and an after tax net discount rate of −2%.

"[S]ince specific forecasts of future price inflation remain too unreliable to be useful in many cases, it will *normally* be a costly and ultimately unproductive waste ... to make such forecasts the *centerpiece* of litigation." *Pfeifer,* 462 U.S. at 548, 103 S.Ct. at 2556 (emphasis added). Here, it appears the concerns addressed in *Pfeifer* have been satisfied. The specific forecast of inflation for medical care services was calculated from the consumer price index by Dr. Bassett. The government's expert, Mr. Walsh, elected not to present any evidence of a specific forecast of inflation; rather, the government's position at trial was that the court should use the real interest rate approach. [Appellant's brief, p. 25]. As we stated in *Trevino,* the district judge may elect any one of several alternative methods to calculate discount rates and

was free to apply the second approach; that is, increase the annual installments for medical care services by the specific estimate of inflation (historical growth rate), and then discount that amount by the market rate of interest. 804 F.2d at 1519; *see Pfeifer,* 462 U.S. at 547–48, 103 S.Ct. at 2555–56.

Nonetheless, the district court's choice is flawed because it relied on estimates of market rate of interest and inflation that were based on the unrepresentative time span from 1954 to 1984. In *Trevino,* we pointed out that the time span from 1954 to 1984 includes the aberrational period from 1974 to 1982; a period marked by recessions, double digit inflation, and extremes in oil prices. 804 F.2d at 1518. We suggested that estimates of both inflation and interest rates be based on longer time periods so as to diminish the effect of shorter aberrational periods. *Id.* The district court erroneously relied on an unrepresentative time span.

### 3. *Treatment of Taxes*

■ In *Beaulieu,* the Alaska Supreme Court held that no deduction should be made for taxes in computing future damages. 434 P.2d at 670–73. In *Hollinger,* we

> adopt[ed] the same approach for taxes as was adopted for the future inflation-interest rates calculation. If the district judge receives reliable figures for tax reduction on future earnings and tax effects on discounted principal, then the calculation should be made. This calculation should be used if it is so much lower than the offset figure as to show that the offset figure would be punitive or result in excessive compensation. If reliable figures are not available or if the offset method is not punitive, then the offset method should be used.

651 F.2d at 643.

According to the record, Johnathan's future earnings were reduced by taxes. Finding of Fact No. 72. We cannot, however, determine whether or how the interest yield of the lump sum award was also reduced by taxes. In *Trevino* we said that

neither earnings or interest yield have to be reduced by taxes; however, if the district court chooses to reduce the future earnings by taxes, it must also reduce the interest yield by taxes. 804 F.2d at 1520. The record is also unclear as to whether or how the district court adjusted for taxes in calculating the medical care services portion of the award.

Accordingly, the district court failed to make sufficient findings for us to determine whether it properly reduced future earnings and medical care for taxes. The court further erred by not computing the Alaska "offset" figure and determining whether it would be punitive.

### G. *Single premium annuity.*

The district court's selection of the discount rate used to determine present value is reviewed for abuse of discretion. *Trevino,* 804 F.2d at 1515; *see Shad v. Dean Witter Reynolds, Inc.,* 799 F.2d 525, 529 (9th Cir.1986) ("The exclusion of evidence, including expert testimony, is reviewed for abuse of discretion."). The government urged the court to use a discount rate based on the cost of purchasing a single premium annuity that would provide an inflation-adjusted income stream equal to the total damages incurred over the course of Johnathan's life expectancy. The government urges that the cost of purchasing such annuities is one means of measuring present value. The government was not asking the court to require appellees to pass up a lump-sum award in favor of purchasing an annuity. Rather, the government was arguing that before making a lump-sum award to pay for estimated future expenses and lost income, the court should consider testimony regarding the cost of purchasing a single premium annuity as a measure of the present value of Johnathan's economic losses.

■ Relying on *Taylor v. Burlington N. R.R. Co.,* 787 F.2d 1309 (9th Cir.1986), the district court excluded all testimony by the government's expert on present value as estimated by the costs of annuities. In that case, however, the district court's decision to reject expert testimony was upheld

because the proffered expert "was not qualified to testify on the appropriate inflation rate." *Id.* at 1316. Here, the government's expert, Mr. Walsh, was qualified and testified as to the present value calculation and, contrary to the appellees' contention, the evidence is relevant to the present value determination. Accordingly, the district court abused its discretion in excluding it.

 Even if the district court abused its discretion in excluding this evidence, "[a] trial court's error in excluding ... evidence in civil actions is harmless if the jury's verdict is 'more probably than not untainted by the error.'" *Diede v. Burlington N. R.R. Co.*, 772 F.2d 593, 594 (9th Cir.1985) (quoting *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir.1985) (internal quotations omitted)). Because there was conflicting evidence concerning the present value of Johnathan's economic losses, exclusion of this evidence was not harmless error.

### III

### *CONCLUSION*

In summary, we affirm the district court's recognition under Alaska law of a parent's claim for damage to the parent-child relationship; affirm the district court in permitting separate awards for pain and suffering and physical impairment under Alaska law; affirm the nonpecuniary award; affirm the award for lifetime attendant care; and affirm the district court's rejection of any setoff for EAHCA benefits from the future medical services award.

We reverse and remand for the district court to recompute the present value of the lost wages portion and the medical care services portion of Johnathan's economic award consistent with this opinion.

We reverse and remand for the district court to clarify and recompute if necessary the tax computation it made for both the wage portion and the medical care services portion of the award consistent with this opinion.

Although the district court is not precluded from awarding a lump sum, we further remand for the district court to consider the annuity evidence when making a present value determination of Johnathan's economic losses.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.