42 F.3d 1401
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Eddy M. PINEDA; Elizabeth Pineda, individually and in their
capacity as parents and guardians of Jeshua A.
Pineda, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 93-15004.
 United States Court of Appeals, Ninth Circuit.
 rgued and Submitted March 16, 1994.
Decided Dec. 7, 1994.
 
 Before: CHOY, REINHARDT, and LEAVY, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The Pinedas filed this action against the United States for medical malpractice under the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b). After a trial, the court found that the evidence did not support the claim that the monitor attached to the Pineda's infant son, Jeshua, indicated numerous high heart alarms in the hours before Jeshua suffered a cardiac arrest that led to permanent brain damage. At issue on appeal is: (1) whether the district court erred by reversing the Magistrate Judge's decision to compel the production of certain witness statements; (2) whether the district court properly denied a post-trial motion to consider new evidence; and (3) whether there was substantial evidence to support the district court's conclusion that no medical malpractice occurred. Because we reverse on the third issue, we do not reach the first or second issues.
 
 
 3
 In determining whether the nursing staff at Tripler acted negligently, the district court's findings of fact and conclusions of law are reviewed under the "deferential, clearly erroneous standard." Louie v. United States, 776 F.2d 819, 822 (9th Cir.1985) (quotation omitted); Yako v. United States, 891 F.2d 738, 745 (9th Cir.1989). If there is substantial evidence to support the district court's decision, it was not clearly erroneous. See Yako, 891 F.2d at 741-745. Substantial evidence means "more than a mere scintilla" but "less than a preponderance: it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir.1991) (quotations omitted). We cannot affirm the district court simply by isolating a certain amount of supporting evidence. Instead, we must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the court's decision. See id.
 
 
 4
 1. Whether There Was Substantial Evidence to Support the Court's Conclusion
 
 
 5
 There were seven witnesses who were present during the afternoon of Jeshua's cardiac arrest on March 9, 1987. Two of these witnesses were Jeshua's parents; two others, the Cochranes, were on the ward with their child; and the remaining three were the nurse, Mary Miller, and two nurses aides, Vicky Johnson Buckelew and Lesa Seales. The uncontroverted evidence from the first four of these witnesses is that the heart monitor repeatedly emitted a "beeping" sound.
 
 
 6
 Nurse's aide Vicki Johnson remembered only that fifteen minutes before the code the monitor reportedly sounded and that she "checked the monitor and checked the baby out and everything was fine." Johnson stated she did not hear the monitor go off, but checked Jeshua in response to a request from Mrs. Pineda. Johnson said the alarm was not on when she arrived at Jeshua's room.
 
 
 7
 Nurse Miller stated she checked the baby with a stethoscope between 3:00 and 4:00 p.m. before the code and found everything normal. She made no records of her examination of Jeshua until the night of March 9, 1987, after the code and the cardiac arrest.[1] Nurse Miller had no recollection of hearing or responding to Jeshua's monitor and she stated she knew next to nothing about the monitor or how it sounded when alarming for life-threatening events. She stated that she had not been told of any alarms by the two nurses aides; that she didn't remember whether Lesa Seales or Vicki Johnson told her the alarm had gone off before the code; but she remembered a conversation in which the three of them had agreed they did not like the Healthdyne monitor placed on Jeshua.
 
 
 8
 Nurse's aide Seales did not remember any problems with the monitor prior to the code. However, she did recall the monitor "beeping slowly" when the code was called. Deposition Testimony at 24, see also at 47. She stated that Nurse Miller falsely stated to an investigator, Sergeant Bryant, on July 21, 1988, that Seales had reported that Jeshua had a breathing problem on March 9, 1987. Seales also stated that Nurse Miller's statement that she told Nurse Miller she should look at the monitor was false.
 
 
 9
 The district court concluded that the alarms that sounded were loose lead alarms rather than cardiac alarms. The court so found because
 
 
 10
 [a] cardiac ... alarm cannot be silenced by pushing the reset control.... [A]larms caused by high or low heart rates will only stop when the heart signals fall within the range for which the monitor is set; pushing the reset button will not stop these alarms. Even should the alarm stop beeping, the alarm light will stay on until the reset button is pushed. Pushing the reset button will, however, silence a loose lead alarm for 30 seconds.... If the alarms were in fact turned off by pushing the reset control, they must have been loose lead alarms.
 
 
 11
 Findings of Fact and Conclusions of Law at 8. But the court's conditional finding that a loose lead was responsible for the alarms is not supported by substantial evidence. Instead, there is only evidence that a cardiac alarm was sounding.
 
 
 12
 The evidence is uncontroverted that a cardiac alarm produces a "beeping" sound.[2] The loose lead alarm produces a continuous tone, not a "beep." The evidence also indicates that, while the reset switch was pushed,[3] it was not the only switch pushed. According to Eddy Pineda, when the alarm went off, the nurse "[went] up to the monitor, it had this black button that says, reset, and she would, you know, place her hands around that area, and I could hear some click, you know. That's what I heard." Reporter's Transcript ("RT") Vol. II, at 15-16 (emphasis added). Then, the monitor "stopped, you know, going off, and ... it started back working again as it was before, like nothing happened." Id. at 16.
 
 
 13
 The "on-off" switch, a silver switch immediately to the right of the black reset button, produces a loud "click" when switched. According to the defendant's expert, Colonel Krom, that on-off switch "will turn the monitor on and then turn the monitor off when it is turned at the same time the reset button is depressed." RT Vol. V at 75 (emphasis added). Lesa Seales, when asked at deposition how she would have turned off the alarm had it sounded, stated: "To reset the alarm, there is a little silver switch on the front." When asked, "Do you recall there being a reset button?" she responded: "Yes, that is the reset button, I think." Deposition Testimony at 39. This testimony is contrary to the district court's finding that the only way to stop the heart alarm from sounding is for the heart signals to return to normal. Thus, in conformance with Eddy Pineda's testimony, all visual and auditory alarms could be turned off by pushing the reset button and, at the same time, pushing the on-off switch to the "off" position. After the monitor is turned back on, approximately thirty-seven seconds are required for the monitor to sound an alarm again if the conditions for an alarm are still present. RT Vol. V at 103, line 13.
 
 
 14
 That a repeating cardiac alarm occurred is supported by the testimony of Sergeant Cochrane, one of the witnesses who heard the monitor beeping:
 
 
 15
 Q. Okay. So is it a fair statement that [the alarms] went off--later in the afternoon they went off more frequently? Is that what you're saying?
 
 
 16
 A. Yes.
 
 
 17
 Q. And is it your recollection that some of them went off almost--well, you testified that they went off in a very short frequency I guess at some point in time.
 
 
 18
 A. That's correct. Some of them seemed to go off right after the other one. As soon as they turned off, it would go back on again almost.
 
 
 19
 Q. And then the nurse would be fetched again? Is that correct?
 
 
 20
 A. That's correct.
 
 
 21
 RT Vol. II at 83, lines 3-15 (emphasis added).
 
 
 22
 This testimony, which is similar to the other witnesses', is consistent with a heart alarm that, after a short pause, continued to sound after the monitor's visual and auditory signals had been shut off by pushing both the reset and the on-off switches. Yet, a thirty-seven second pause is sufficient for a nurse to leave the immediate vicinity. The evidence, considered as a whole, is not consistent with a loose lead alarm (constant tone) that could be reset simply by pushing the reset button. It is consistent only with a cardiac alarm which, contrary to the court's findings, could be turned off.[4]
 
 
 23
 The district court relied heavily on the testimony of Professor Michael Heymann, M.D. Dr. Heymann stated:
 
 
 24
 In infancy episodes of SVT (or atrial flutter) may be intermittent or persistent. However when symptoms occur they generally present with a more prolonged period of rapid rhythm and not with short, intermittent bursts that might intermittently trigger a monitor alarm set to identify a rapid heart rate. Based therefore on the natural history of SVT, the long period of normal heart rate after the initial episode and the persistent nature of his first two documented episodes of SVT on March 26 and 27, one is forced to conclude that Jeshua did not have repeated episodes of SVT over many hours prior to the first arrest on March 9 and that indeed any alarms that may have sounded intermittently from the apnea monitor were indeed triggered by other mechanisms such as motion artifact which so commonly occurs with these types of monitors.
 
 
 25
 ER tab 147 at 19. However, the evidence from the witnesses present at the event, as described above, is consistent "with a more prolonged period of rapid rhythm" and "not with short, intermittent bursts that might intermittently trigger a monitor alarm set to identify a rapid heart rate."
 
 
 26
 Finally, the district court erred by misconstruing the appellants' claim for negligence as "not detecting Jeshua's susceptibility to SVT." The appellants are not claiming negligence in the failure to diagnose the Wolff-Parkinson-White syndrome and thus the susceptibility to the SVT. Rather, the appellants' "principle theory of liability is that the one nurse and two nurses aides on duty on the pediatric surgical ward on the afternoon of March 9, 1987, failed to respond in a minimally acceptable manner to the repeated and increasingly frequent 'high heart' alarms generated by Jeshua's cardiac-respiratory monitor prior to his arrest, and that a proper response to even one of these frequent monitor alarms would have prevented Jeshua's catastrophic brain injury."
 
 
 27
 Most of the evidence must be ignored or discredited to come to the same conclusion as the district court. See Baxter, 923 F.2d at 1394. Therefore, there is not substantial evidence to support the district court's finding that loose leads were causing the alarm. The district court clearly erred where substantial evidence to support its conclusion was lacking.
 
 
 28
 Because of the district court's conclusion, it never reached the issue of proximate cause; that is, whether the failure to respond to the high heart alarm caused the injury that rendered Jeshua permanently brain damaged. Where the record permits only one resolution of a factual issue, we need not remand but may conclude the issue on appeal. See Pullman-Standard v. Swint, 456 U.S. 273, 291-92 (1982) (where a district court "has failed to make a finding because of an erroneous view ... there should be a remand for further proceedings.... unless the record permits only one resolution of a factual issue.").
 
 
 29
 Dr. Heymann described the injury that led to Jeshua's brain damage:
 
 
 30
 Generally speaking, Jeshua developed persistent tachycardia which led to a progressive fall in cardiac output, and blood pressure and thereby reduced oxygen delivery to the tissues of his body. As a result of the progressive tissue hypoxia (lack of oxygen), particularly to the central nervous system and more particularly the centers that control breathing, he developed apnea, or respiratory arrest and finally cardiac arrest.
 
 
 31
 Supplemental ER at 95. Dr. Heymann, who assumed that the alarms were false before the code was called on March 9, describes two scenarios as to how Jeshua's injury could have occurred so rapidly:
 
 
 32
 Based on the detailed clinical descriptions and the ECG evidence surrounding his second respiratory arrest on March 26, at which stage he tolerated an episode of SVT for a period of about 15 minutes before showing significant respiratory embarrassment, and also based [on evidence from electrophysiological studies performed on Jeshua], I would consider that 2 possibilities exist regarding the type of tachycardia involved. Firstly that he may have developed atrial flutter with a very fast ventricular rate that led very rapidly, probably over a period of 3-5 minutes, to hypoxia, respiratory arrest and eventually cardiac arrest. Secondly that he developed SVT which would probably have lead to hypoxia over a more prolonged period of perhaps 8-10 minutes. However, it is more likely that Jeshua had SVT with a very rapid rhythm, one even slightly faster than the one recorded on March 27 ... which was 320/minute, which too could have produced quite rapid decompensation and poor cardiac output with resulting apnea.
 
 
 33
 Supplemental ER at 96. If Dr. Heymann's hypotheses were accurate, as the government contends, then Jeshua's injury could not have been prevented because he went into respiratory and cardiac arrest, with resulting brain damage, so quickly. However, as we have concluded, the evidence is that the monitor was registering a high heart alarm, which went unattended until the code was called. The question then becomes whether earlier intervention would have prevented Jeshua's injury. Based on the record, the answer is "yes."
 
 
 34
 It is undisputed that if a member of the nursing staff had confirmed Jeshua's high heart rate, the standard of care would have required immediate evaluation and a physician's intervention in an intensive care unit.[5] See RT Vol. III at 40 (testimony of Dr. Guntheroth); RT Vol. IV at 39 (testimony of Dr. Pantell); RT Vol. VI at 6 (testimony of pediatric nurse Heffernan). On cross examination, Dr. Heymann testified that if Jeshua's rapid heart rate had been confirmed before the code on March 9, he probably would have been resuscitated without injury, as he was on March 26:[6]
 
 
 35
 Q. Okay. And within that period of time [on March 26] they ordered an EKG, diagnosed the rhythm and were prepared for appropriate resuscitation when, in fact, it occurred in that short period of time [i.e., 15 or 20 minutes before a code was called]. Is that correct?
 
 
 36
 A. And in fact carried it out, yes.
 
 
 37
 Q. Okay. And do you think that was appropriate treatment for that child on the 26th?
 
 
 38
 A. I saw nothing inappropriate.
 
 
 39
 Q. Okay. And would you have expected that if the nurses had picked up the rapid heartbeat [on March 9th], even within your 15 or 20 minute scenario, that they should have called the doctor, had an EKG and followed the same procedure they did on the 26th?
 
 
 40
 A. I think they would have, then.
 
 
 41
 Q. All right. And do you have an opinion about if they would have, whether it would have resulted in a similar-type of resuscitation as occurred on the 26th?
 
 
 42
 A. One would suspect so. You know, nothing is ever absolute, but I think had it been present they would have detected it and would have responded.
 
 
 43
 RT Vol. IX at 44-45.
 
 
 44
 Jeshua suffered persistent or recurring episodes of high heart rate on March 9, 1987, that were undetected by the nursing staff. There is also testimony from the government's expert witness that had the high heart rate been detected and attended to appropriately, Jeshua would have been resuscitated without injury, as he was on March 26, 1987. Because this record permits only one resolution of the question of causation, see Swint, 456 U.S. at 291-92, we reverse and remand for the computation of damages.
 
 
 45
 REVERSED and REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 There are no contemporaneous records of any kind to substantiate the nursing staff's responses to Jeshua
 
 
 [2]
 Either the high or low cardiac alarms may be described as a "beeping" sound
 
 
 [3]
 The reset switch must be pushed in order to turn off the four red alarm lights: high heart, low heart, respiratory, and loose lead
 
 
 [4]
 Elizabeth Pineda's testimony at trial was that the reset switch was pushed and the alarm stopped:
 Q. You saw her push reset, correct?
 A. Yes.
 Q. And all she did was push reset, correct?
 A. She used one hand. What she's doing with another finger, I don't know.
 Q. So you're saying that you're not sure that all she did was push reset?
 A. She pushed reset, I know that.
 Q. But she didn't do anything else; did she?
 A. I just listened to the machine.
 RT Vol. I at 94. This testimony is not inconsistent with that of Eddy Pineda. Further, because no clarifying questions were asked, it is also not inconsistent with Elizabeth's deposition testimony:
 Q. "All she did was push the reset button?"
 A. Answer--Yes. "Right."
 RT Vol. 1 at 96.
 
 
 [5]
 Mary Miller Riley stated that if she had known that Jeshua's heart rate was 250 beats per minute, she would have "[d]efinitely called the doctor immediately." Exh. 20 at 87-88. She also stated that Jeshua would have been transferred into the neonatal intensive care unit. Id. at 88, lines 13-17
 
 
 [6]
 Dr. Heyman describes Jeshua's second episode of SVT following the injury he suffered on March 9: "[o]n March 26 Jeshua had a documented single occurrence of SVT that was persistent until medically terminated and that caused him to have a respiratory arrest after approximately 15 minutes of rapid heart rate." Supplemental ER, tab 147 at 19