Martin LOZADA, Sr., Father, and Next Friend, for and on Behalf of, Martin LOZADA, Jr., A Minor, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CV 86–0–602.

United States District Court, D. Nebraska.

May 6, 1991.

**406**

J. Thomas Rowen, Carpenter, Rowen & Fitzgerald, Omaha, Neb., for plaintiff.

Ronald D. Lahners, U.S. Atty., Paul W. Madgett, Asst. U.S. Atty., Omaha, Neb., for defendant.

## MEMORANDUM OPINION

CAMBRIDGE, District Judge.

This matter is before the Court for disposition following a two day trial to the Court. Plaintiff Martin Lozada, Sr. brought this action against the United States on behalf of his son, Martin Louis Lozada, Jr. (Louis), under the Federal Tort Claims Act, 28 U.S.C. § 2401 et seq. Plaintiff asserts professional medical negligence by various Air Force doctors and medical personnel in connection with the delivery and medical care of Louis at Ehrling Bergquist Regional Air Force Hospital, Offutt Air Force Base, Bellevue, Nebraska, on or about October 1, 1986. On the morning that trial was to begin, May 2, 1990, the government admitted liability on plaintiffs' claim for professional medical negligence. Trial then proceeded solely on the issue of damages. The following shall constitute the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

## FACTUAL BACKGROUND

Staff Sergeant Carolyn Lozada was a member of the United States Air Force during her pregnancy in 1986 and received prenatal services at Ehrling Bergquist Hospital. Ehrling Bergquist Hospital is a regional Air Force hospital, owned and operated by the United States Air Force at Offutt Air Force Base (OAFB) in Bellevue, Nebraska.

On September 26, 1986, Staff Sgt. Lozada was one and one-half weeks past her delivery due date. She was scheduled for labor to be induced at Ehrling Bergquist Hospital on September 29, 1986, but due to lack of a fetal monitor and unavailability of medical personnel, labor was not induced until 1:00 p.m. September 30.

After several hours of labor induction, Staff Sgt. Lozada experienced a spontaneous rupture of the fetal membranes. Staff Sgt. Lozada's physician, a licensed obstetrician and gynecologist and officer of the U.S. Air Force, decided to continue her labor with pitocin stimulation.

The next day, on October 1, 1986, at approximately 9:40 a.m., fetal heart decelerations were identified on the fetal monitoring strip. Between 10:15 and 10:30 a.m., fetal heart decelerations increased and a rapid delivery was indicated. Staff Sgt. Lozada's physician was unavailable and an attempt to reach a second staff obstetrician was unsuccessful at that time. Lozada's physician arrived at 12:15 p.m. His attempts at a vaginal delivery were unsuccessful, and at 12:40 p.m. rapid sequence anesthesia was administered in order to perform a cesarean section delivery. The anesthesiologist had difficulty intubating Staff Sgt. Lozada, however, due to prior vocal cord surgery, and thus the cesarean section was not accomplished until 1:05 p.m. At that time, a severely asphyxiated male infant, plaintiff Martin Louis Lozada, Jr., was delivered, who was immediately flown to the University of Nebraska Neonatal Intensive Care Unit in Omaha, Nebraska.

Louis was hospitalized for approximately 16 days with complications of sepsis, group

B strep, hypoxic ischemic encephalopathy, cerebral edema, and neonatal seizures. Thereafter, Louis' parents were transferred to Washington, D.C., where Louis could be followed in a management program for cerebral palsy, which included physical therapy, occupational therapy, speech and language therapy and other rehabilitation programs at Walter Reed Army Medical Center.

Louis, 3 years and 7 months of age at the time of trial, attended the trial with his mother and father, Staff Sgt. Lozada and Martin Lozada, Sr. Dr. Bruce A. Buehler, Professor of Pediatrics and Director of Meyer Children's Rehabilitation Institute at the University of Nebraska Medical Center, testified as an expert for the plaintiffs after he and his staff had evaluated Louis over a four day period. Dr. Buehler's medical opinion was that Louis was a brain damaged, spastic quadriplegic child with profound motor involvement and profound mental retardation. He stated that Louis required continuous, newborn infant care and that his condition, i.e., brain damage, was considered permanent. He explained that although Louis will mature and will make some progress in the future, he will continue to fall further and further behind the developmental norms of motor and intellectual functioning for his age. He stated that Louis was presently functioning at a profound level in all areas of development: motor movement and coordination, feeding, speech, social interaction, and self-help skills.

Dr. Buehler testified that Louis will need intensive physical therapy through age 20 to mold his bones and to prevent contractures. Thereafter, he will need less motor therapy and more environmental adaptive therapy. Louis will also need to continue occupational therapy throughout his life, with a major focus on his feeding problems. Dr. Buehler hoped that some day Louis would be able to assist in feeding himself. Louis will also need speech therapy. Dr. Buehler did not anticipate that Louis would ever develop speech, but hoped that he would be able to develop some nonverbal communication skills. Dr. Buehler also stated that Louis will proba-bly require behavioral therapy and management, which is common for severe to profoundly retarded children.

Dr. Buehler also testified that special equipment will be needed to accommodate Louis in the future: body and leg braces, a specially equipped van for transportation, a motorized wheelchair, and mobile prone stander. He stated that Louis' future will also consist of regular evaluations and treatments by a pediatrician, neurologist, orthopedist, ophthalmologist, dentist and orthodontist. He noted that Louis may require eye surgery at some point to correct a muscle pull, and that hip release, heel cord lengthening and rhizotomy surgeries might also be expected. Dr. Buehler stressed that overall health maintenance would have a direct bearing on Louis' life expectancy.

Dr. Buehler further testified that Louis will continue to need phenobarbital, an anti-convulsive medication, for the rest of his life; he stated that seizure activity with this type of child tends to increase as the child gets older. He also testified that Louis will also need to increase his muscle relaxant medication as he grows. He further noted that Louis will be dependent on dietary supplements and diapers throughout his lifetime.

Dr. Buehler also testified that Louis will require respite care, i.e., someone with nursing training to come into the home, especially as he gets older and more difficult to manage. He stated that although he considered Louis' parents to be exceptionally outstanding in their attitude and approach to handling Louis' handicap, respite care would be necessary to give the Lozada's periodic breaks from the day-to-day stress of managing this child. He noted that family "burn-out" is a common occurrence in families caring for a severe to profoundly handicapped child where there has been no provision for those families to periodically get away.

Dr. Buehler opined that Louis' life will be custodial in nature, and that he would receive the best care by continuing to live with his parents as long as possible. Dr.

Buehler anticipated, however, that Louis will probably need to be institutionalized when he is approximately 20 years of age because he will become increasingly difficult to manage at home.

Assuming that Louis will continue to receive good, regular medical care with his parents and that there continue to be advances in medicine for maintaining the general health of severely to profoundly handicapped individuals, Dr. Buehler anticipated that Louis' life expectancy will be in the early 30 year range; without those assumptions, however, he believed that Louis' life expectancy was realistically within the 20 to 25 year range.

Louis' mother testified that she and her family are now stationed at Andrews Air Force Base in Maryland. There, Louis attends a special school half-days, five days a week for speech, occupational and physical therapy. She stated that Louis must wear inhibitive leg casts, glasses, and diapers; that he requires special food because he is unable to chew; that he regularly takes phenobarbital to control his seizures; that he has no speech other than vocalizations and screams; that he seems to recognize his family members; that he cannot walk or stand, but can drag himself along the ground using a combat-style crawl with his arms; that the right side of his body has a greater degree of motor damage; that he frequently engages in self-abusive activities, such as biting his hands or hitting his head; and that he requires a great deal of assistance to eat. She noted that Louis appeared to be regressing in school, because he was not accomplishing some of the IEP goals that he had previously accomplished on his individualized education program (IEP). She stated that Louis was at a 2½ to 5 month functioning level on his IEP. Staff Sgt. Lozada also described the difficult daily routine of tending to Louis' basic needs, e.g., getting him up in the mornings, dressing, bathing, feeding. Many of these activities are documented on a videotape recording which has been reviewed by the Court (Exhibit 2). Staff Sgt. Lozada stated that they have attempted to provide Louis with various kinds of social/cultural stimulation, but that activities outside the home, e.g., going to a restaurant, present many practical difficulties because of Louis' limitations.

With respect to Louis' medical expenses, Staff Sgt. Lozada testified that most of the medical bills have been paid through the Civilian Health and Medical Program of the Uniformed Service (CHAMPUS), a medical benefit program provided by the federal government. Through that program, she and her husband pay only $25.00 for every $1,000.00 of approved medical expenses. She noted, however, that she and her husband pay approximately $200.00 per month for special food and diapers which CHAMPUS does not cover.

Staff Sgt. Lozada testified that her period of enlistment with the Air Force will end in 1995 and that she does not intend to reenlist *unless* she and her husband are unable to otherwise manage Louis' medical bills.

With respect to the plan for Louis' care in the future, Staff Sgt. Lozada stated that she did not want Louis to be institutionalized and that she wanted to keep him home if at all possible.

The Court also received testimony from Martin Lozada, Sr., Louis' father. He confirmed his wife's testimony with respect to Louis' activities and abilities, their CHAMPUS coverage and their desire to keep Louis at home for as long as possible. Mr. Lozada stated that he is scheduled to be discharged from the Air Force in December 1990, and that he would like to get into the civil work force, but that he will reenlist if it is necessary to continue Louis' medical benefits. He noted, however, that with the proposed federal cutbacks in the armed services there is a chance he will not be permitted to reenlist.

The Court observed Louis at trial to be a child with significant physical and mental limitations for a child of his age. He appeared, however, to be happy, well-groomed, and fairly responsive to his mother. His extremities were very rigid and uncoordinated, and when placed in a prone position he was able to crawl slowly across the floor by dragging himself with his

arms. He was unable to sit or stand without total support.

To assist the Court in assessing damages, plaintiff offered the testimony of Edith E. Hunter, a Registered Nurse and certified rehabilitation specialist, who was familiar with the costs of orthotics, adaptive equipment, catastrophic physician services, respite care, hospital services, and home and institutionalized care in Nebraska and across the nation. She had prepared a life care plan for Louis (Ex. 14), outlining the various types of services, equipment and specialized care Louis will need in the future and the respective costs under that plan. Ms. Hunter based her report on Dr. Buehler's opinion that Louis has a life expectancy of 25–30 years.

Plaintiff also offered the expert testimony of Jerome F. Sherman, Ph.D. and Associate Professor of Finance at Creighton University, on the issues of economic loss in this case. Dr. Sherman had prepared a projection of economic loss based on Edith Hunter's life care plan of costs, which was admitted into evidence (Ex. 15). Defendant called its own expert witness, Nidal Shaar, an economist with Johnson & Higgins in Washington, D.C., who also provided the Court with an economic loss analysis based on Edith Hunter's report (Ex. 17–20).

## ISSUES

The issues related to damages which must be resolved by the Court include: (1) Louis Lozada's life expectancy; (2) the amount of damages for future medical expenses; (3) the amount of damages for loss of earning capacity; (4) the amount of non-economic damages; (5) whether the Nebraska Hospital–Medical Liability Act, Neb. Rev.Stat. § 44–2825, limits an award of damages to $1,000,000.00; and (6) whether the judgment award should be distributed in lump sum or under a scheduled payment plan.

## DISCUSSION

A. *Damages Under Federal Tort Claims Act & Nebraska Law*

■ By waiving sovereign immunity under the Federal Tort Claims Act, Congress has permitted the United States to be held liable for personal injuries caused by the negligence, wrongful act or omission of government employees, acting within the scope of their office or employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). In other words, the United States may be held liable to the same extent as would a private person under state law. *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976); *Bernie v. United States*, 712 F.2d 1271 (8th Cir.1983). The United States may not, however, be held liable for punitive damages. 28 U.S.C. § 2674.

■ In Nebraska, the proper measure of damages in a negligence case is that which will place the aggrieved party in the position in which he would have been in had there been no negligence. *Stansbery v. Shroeder*, 226 Neb. 492, 496, 412 N.W.2d 447 (1987). "The fact that the amount of damage may not be susceptible of exact proof or may be in a degree uncertain or difficult of ascertainment should not be bar to any recovery." *Lake v. Southwick*, 188 Neb. 533, 538, 198 N.W.2d 319, 322 (1972). "'Damages for a permanent injury may not be based on speculation, probabilities, or uncertainty but must be shown by competent evidence that such damage is reasonably certain as the proximate result of the pleaded injury.'" *Id.*, 198 N.W.2d at 321 (quoting *Schwab v. Allou Corp.*, 177 Neb. 342, 128 N.W.2d 835 (1964)).

■ The proper measure of damages for personal injury in Nebraska is summarized in *Nebraska Jury Instructions 2d* § 4.01 (1990). Where the plaintiff has proven that a negligent act of the defendant proximately caused plaintiff's injuries, the plaintiff is entitled to be fairly compensated for such injuries. In deciding what amount constitutes fair compensation, the Court must consider the factors set out in NJI 2d Instruction § 4.01, the following of which are relevant to this case:

1. The nature and extent of the injury, including whether the injury is temporary or permanent and whether any resulting disability is partial or total;

2. The reasonable value of the medical (hospital, nursing, and similar) care and supplies reasonably needed by and actually provided to the plaintiff and reasonably certain to be needed and provided in the future;

3. The reasonable value of the earning capacity the plaintiff is reasonably certain to lose in the future; and

4. The physical pain and mental suffering the plaintiff has experienced and is reasonably certain to experience in the future.

*Id.* Under Nebraska law, the Court may not award any damages by way of punishment or through sympathy, *id.*, and any award for future losses must be reduced to their present cash value. *See* NJI 2d Instruction § 4.13 and comments.

### B. *Life Expectancy of Louis Lozada*

■ Before considering the economic analyses for future medical care and loss of earning capacity which were submitted at trial, the Court must first determine the realistic life expectancy of Louis Lozada. The only testimony elicited on this issue was that of Dr. Buehler. On direct examination, Dr. Buehler testified that, being optimistic and assuming continued good medical care by his parents and continued advances in this area of medicine, Louis' life expectancy would probably be in the early 30 year range. Without those assumptions, however, a life expectancy of 20 to 25 years of age would be realistic. A pessimistic estimate would be in the early 20's. After giving such testimony, Dr. Buehler was advised during re-direct examination that Louis' most recent school report indicated that Louis had lost some developmental skills and was estimated to be functioning at a 2½ to 5 month developmental level. Upon hearing this, Dr. Buehler stated, "That would be concerning."

■ Having carefully considered Dr. Buehler's testimony, and being mindful that the law requires that all elements of damages be determined with "reasonable certainty," *Midlands Transp. Co. v. Apple Lines, Co.*, 188 Neb. 435, 197 N.W.2d 646, 648 (1972), the Court concludes that the evidence has established that a realistic life expectancy for Louis Lozada is 25 years of age. This finding takes into consideration the family's strong interest in continuing to keep Louis with them for as long as possible and to provide him with good medical services, as well as the likelihood that medicine will continue to make some advances in the treatment of the life-threatening conditions, e.g., pneumonia, which commonly afflict the profoundly physically handicapped.

### C. *Future Medical Expenses*

As noted above, Dr. Jerome Sherman and Nidal Shaar each provided the Court with analyses of their projected economic losses for future medical expenses based on the life care plan prepared by Edith Hunter. The government does not contest most of Ms. Hunter's recommendations and costs for future medical expenses. It does dispute, however, her suggested costs in four areas: (1) electric wheel chairs; (2) Van-Club Wagon; (3) respite care; and (4) hospitalization.

#### 1. *Electric Wheel Chairs*

■ With respect to the first category, Ms. Hunter suggested that Louis will need an electric wheel chair at age 15, and thereafter will need a replacement chair every 5–6 years as well as an annual replacement of batteries (Ex. 14 at 5). The government argues that there is insufficient medical evidence to show that Louis will ever be able to operate or otherwise an electric wheel chair. The Court agrees. The plaintiff need not establish with certainty that Louis will develop the cognitive and motor abilities to utilize an electric wheelchair in the future; however, the evidence must be more than merely speculative in nature. While Dr. Buehler and Wayne A. Stuberg, Ph.D., physical therapist and Director of Physical and Occupational Therapy at Meyer's Childrens' Rehabilitation Institute (Depos. Ex. 9 at 9–11), expressed hope that Louis will someday develop such skills,

these specialists reserved judgment as to whether Louis will ever be able to operate an electric wheel chair on his own. This evidence, without more, is insufficient to support a finding that Louis will require an electric wheel chair at age 15 or beyond. Therefore, the Court will disallow any future medical damages for this item.

### 2. *Van Club Wagon*

■ With respect to Ms. Hunter's recommendation that Louis will need a Van–Club Wagon at age 10 and a replacement vehicle every 5–7 years thereafter until his life expectancy (Ex. 14 at 5), the government argues that Ms. Hunter failed to take into consideration that Louis will probably require a specialized nursing facility at age 20 throughout the remainder of his life and that there would be some trade-in value of the van at the time of replacement and at the time Louis is placed in a nursing facility. The Court agrees and concludes that (a) plaintiff's recovery for a Van–Club Wagon should not include any costs for a van or its maintenance beyond the time that Louis turns 20 years of age, and (b) the government should receive credit for the reasonable trade-in value of two vans, one of which would be purchased at age 10 and the other of which would be purchased at age 15. Ms. Hunter testified that

$5,000.00 would be the reasonable trade-in value of a van.

### 3. *Respite Care*

■ With respect to Ms. Hunter's recommendation that Louis will need respite care on a weekly, monthly, and annual basis (Ex. 14 at 9), the governments disputes Ms. Hunter's mixture of nurses aides and licensed practical nurses (LPN's) on a monthly and annual basis. Specifically, the government asserts that the evidence supports that adequate respite care could be provided by a mixture of 16 hours of nurses aide care and 8 hours of LPN care, rather the mixture of 16 hours of LPN care and 8 hours of nurse aide care suggested by Ms. Hunter. The Court agrees. Ms. Hunter testified that the primary limitation of using nurses aides to care for Louis is that they are not allowed to administer his medications. At the present time Louis receives phenobarbital in the morning and at bedtime, and thus those would be the only times that an LPN would be required for his care. As the government points out, the mixture of 16 hours of nurses aide care and 8 hours of LPN care (two 4–hour shifts) should be adequate to cover Louis medication times at a lower cost to the government. Therefore, in calculating damages for monthly and annual respite care, the Court shall use the government's proposed mixture of nurses aides and LPN's, as follows:

Cost per Year

| | | |
|---|---|---|
| Monthly Respite | Nurses aide 32 hours/month @ $9.50/hour, and | |
| | LPN 16 hours/month @ $15.00/hour | $6,528.00 |
| | | |
| Annual Respite | Nurses aide 16 hours/day for 14 days @ $9.50/hour | |
| | LPN 8 hours/day for 14 days @ $15.00/hour | $3,808.00 |

### 4. *Hospitalization*

■ With respect to Ms. Hunter's recommendation that Louis will require hospitalization averaging $5,006.00 every other year from the present to 15 years of age and then $5006.00 every 3–5 years of age until his life expectancy, the government

argues that most of the hospitalization expense anticipated by Ms. Hunter, i.e., $45,052.00 through age 23, is not supported by competent medical testimony. The government asserts that only $8,153 for the orchiopexy ($2,716), strabismus surgery ($2,144), and heel cord lengthening ($3,293)

is supported by the evidence. The Court disagrees. Dr. Buehler's testimony and several of the depositions offered into evidence, as well as common sense, support the conclusion that Louis will require additional hospitalizations for complications beyond the surgeries mentioned above. Dr. Buehler specifically noted that Louis will probably require hip release surgery and that children such as Louis are particularly prone to developing pneumonia. The Court also notes that Ms. Hunter's hospitalization figures were based upon information she obtained from the rehabilitation specialists at Meyer's Childrens Rehabilitation Institute and upon her own experience in developing life care plans for profoundly mentally and physically handicapped children. The government produced no evidence to rebut this evidence. Therefore, the Court will not reduce Ms. Hunter's estimates for hospitalization costs through age 25.

5. *Analysis of Future Medical Expenses*

Having addressed the government's specific concerns with respect to Ms. Hunter's life care plan, the Court now turns to the economic loss analyses for future medical expenses offered by the two expert witnesses at trial. Having considered both experts' economic predictions of future medical costs, the Court concludes that the report offered by the government's expert, Nidal Shaar, provides a more precise prediction of Louis' future medical costs (Ex. 17–20). Using government economic statistical reports, Mr. Shaar utilized the specifically appropriate inflationary factor for each of the various medical needs categories outlined in Ms. Hunter's life care plan. He also properly reduced all future medical costs to present value using a discount rate of 7.5%, which is the average interest rate on a 10–year government bond over the past 30 years. Based on Mr. Shaar's computations, Louis' future medical expenses, reduced to present value, total $586,-187.00.[1]

 The Court finds, however, that Mr. Shaar's computation of $586,187.00 requires the following adjustments: (1) in the category of personal care, the cost of institutional care should replace the cost of home care at age 20 in the year 2007, *see* n. 1, *supra*, therefore, the total of future medical expenses should be increased by $18,470.00, which is the present value of such institutional care; (2) with respect to respite care to the age of 20, the total of future medical expenses should be reduced by $26,000.00, which is the present value of such care; and (3) with respect to equipment, the total of future medical expenses should be reduced by $7,883.00 for a Van Club Wagon and by $13,843.00 for electric wheel chairs, which are the present values of such equipment.

The government argues that an additional reduction of future medical expenses should be made with respect to (a) medical expenses paid by CHAMPUS during the first five months of 1990, and (b) CHAMPUS coverage throughout the Lozadas' enlistment period, which will be concluded sometime in 1995 when Staff Sgt. Lozada intends to conclude her military service. Plaintiff argues that any medical expenses covered by CHAMPUS should not be considered as a set off to any award for medical expenses, because such set off would violate Nebraska's collateral source rule.[2]

---

1. This amount is reflected on Attachment B, appended to defendant's post trial brief. Attachment B combines the calculations offered to the Court in defendant's Exhibits 19 and 20. Attachment B replaces the cost of home care for Louis, ages 21 through age 25, with the cost of institutional care which will be necessary. As noted *infra*, however, Attachment B does not reflect that institutional care will also be needed beginning at age 20, in the year 2007, and thus the Court will make an additional adjustment to replace the cost of home care with the cost of institutional care in the year 2007.

2. The collateral source rule was summarized by the Nebraska Supreme Court in *Huenink v. Collins,* 181 Neb. 195, 147 N.W.2d 508 (1966), as follows:

Under the collateral source rule or doctrine, the fact that the party seeking recovery has been wholly or partially indemnified for the loss by insurance cannot be set up by the wrongdoing in mitigation of damages, where the wrongdoing did not contribute to the procurement of insurance.

*Id.* 147 N.W.2d at 509.

Plaintiff relies on *Mooney v. United States*, 619 F.Supp. 1525, 1529–30 (D.N.H. 1985), where the court concluded that CHAMPUS benefits could not be used to reduce plaintiff's damage award.

This issue has never been decided by Eighth Circuit. Having carefully considered other caselaw which have addressed the issue, the Court concludes that plaintiff's reliance on *Mooney* is misplaced and that the analysis and holding in *Mays v. United States*, 806 F.2d 976, 977–78 (10th Cir.1986), *rev'g*, 608 F.Supp. 1476 (D.Colo.1985), *cert. denied*, 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987), is the better rule.

In *Mays v. United States*, a Federal Tort Claims Act action, the Tenth Circuit concluded that CHAMPUS benefits were not derived from a source collateral to the United States' general revenues, and therefore the government was entitled to have those benefits deducted from plaintiff's damage award. *See also Diaz v. United States*, 655 F.Supp. 411, 418 (E.D.Va.1987) (holding that government may deduct CHAMPUS payments for plaintiff's medical expenses). In *Mays*, the Tenth Circuit held that,

> [G]overnment payments are collateral if the payments come from "a special fund that is separate and distinct from general government revenues" and to which the plaintiff has contributed. Our question * * * therefore, is whether CHAMPUS benefits satisfy this test.
>
> \* \* \* \* \* \*
>
> "The funds used by the CHAMPUS program are appropriated funds furnished by the Congress through the annual Appropriations Act for the Department of Defense and the Department of Health, Education, and Welfare [now the Department of Health and Human Services.]" 32 C.F.R. § 199.7(E–1) (1985). *All of the money for the CHAMPUS program comes from the general treasury of the United States;* no money is paid directly into the fund by the recipients of CHAMPUS benefits. We cannot view these general appropriations to the CHAMPUS program as "a special fund that is sepa-

rate and distinct from general government revenues." CHAMPUS payments come exclusively from the general revenues of the United States. Therefore, such payments are not from a source collateral to the United States.

*Id.* at 977 (citations and footnotes omitted) (emphasis added). In a footnote, the Tenth Circuit acknowledged that *Mooney, supra,* had reached a contrary conclusion, but gave it no weight because the district court's holding conflicted with its own finding that the source of CHAMPUS payments was unclear. *See id.* at 977 n. 2.

Because this Court agrees that the decision in *Mooney* is not well founded, and that the reasoning set forth in *Mays* is the better rule, the CHAMPUS benefits (a) already paid during the first five months of 1990, and (b) to be paid throughout Staff Sgt. Lozada's enlistment period, will be deducted from the damages to be awarded for Louis' medical expenses. The amount of those CHAMPUS benefits, reduced to their present value, is $51,391.00.

Based on the foregoing and having made the appropriate adjustments, the Court concludes that the plaintiff is entitled to recover $495,680.00 for future medical expenses.

### D. *Loss of Earning Capacity*

Under Nebraska law, damages for permanent injuries which have impaired the individual's future earning capacity are computed based upon the individual's life expectancy immediately before the injury. *Borcherding v. Eklund,* 156 Neb. 196, 207, 55 N.W.2d 643, 651 (1952); *Crecelius v. Gamble–Skogmo, Inc.,* 144 Neb. 394, 403–04, 13 N.W.2d 627, 632 (1944). Thus, Nebraska follows the prevailing American rule that "a tort victim suing for damages for permanent injuries is permitted to base his recovery 'on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury.'* " *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 595, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974) (citations omitted) (emphasis in original). Following this rule, plaintiff's loss of earning capacity will be

computed to what Louis' life expectancy would have been, but for his injury.

■■■ The Court found Mr. Shaar's testimony and evidence as to loss of earning capacity persuasive. At trial, Mr. Shaar testified that plaintiff's loss of earnings to normal life expectancy, with deductions taken for income taxes and FICA, would be $301,483.00. Plaintiff argues that income taxes and FICA may not be deducted in determining loss of earning capacity under Nebraska law. The Court notes, however, that in *Ott v. Frank*, 202 Neb. 820, 823–24, 277 N.W.2d 251 (1979), the Nebraska Supreme Court held that prospective increases in wages and potential liability for income taxes are proper matters to be covered in the evidence. Therefore, deductions for income taxes and FICA may be considered in determining plaintiff's loss of earning capacity, provided that such deductions are not speculative.

In this case, Mr. Shaar's computations are not speculative. The Court finds that Mr. Shaar's deductions for income taxes and FICA are proper, because "a successful plaintiff is entitled to be made as financially secure as he would have been had there been no injury or death, but no more." *Flannery v. United States*, 718 F.2d 108, 112 (4th Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984). Therefore, the Court will not make any adjustment to Mr. Shaar's calculations with respect to income taxes and FICA.

■■■ Relying on *Flannery v. United States, supra*, 718 F.2d at 112, the government makes the argument that much of plaintiff's calculated loss of earnings through his actual life expectancy, i.e., age 25, is a duplication of his future medical expenses. The Court in *Flannery* noted,

In the usual case, a living plaintiff must pay his own living expenses, though an award for lost earnings may be the source of his funds. In this case, however, the plaintiff [who is comatose] will be required to pay nothing, for the award of future medical expenses includes all of the personal expense that the plaintiff will incur. * * * His personal expenses will be to provide himself with housing, food, and nursing and custodial care of the kind provided in a nursing home. That is the expense covered by the award for future medical expense. * * * [I]n truth, the judgment requires the United States to pay the plaintiff's personal living expenses twice. Thus, the award for lost earnings, as finally determined, should be reduced * * *.

*Id.* at 112. *But see, Yako v. United States*, 891 F.2d 738, 746–47 (9th Cir.1989). Here, the government argues that the award for loss of earnings should be reduced by that amount which the government will already be paying as future medical expenses for plaintiff's residential care from age 20 to actual life expectancy. Based on Mr. Shaar's testimony that typically 28% of a person's gross income is applied toward housing and 30% toward food, the government asserts that the Court should reduce the present value figure for each year that the plaintiff will be in residential care by 58%. The Court agrees, and thus will reduce the award for loss of earning capacity, set forth in Exhibit 18, by $34,425.00.

Having made the proper adjustments, the Court will award plaintiff the sum of $267,058.00 for loss of earning capacity.

E. *Non–Economic Damages*

■■■ Plaintiff is a brain damaged, profoundly retarded and motor handicapped boy with a future of total custodial care. Clearly, no amount of money can restore plaintiff's health and condition in order that he can lead a normal life. In addition to recovering future medical expenses and future loss of earnings, plaintiff is entitled to recover a reasonable amount as compensation for the injury, pain and suffering and inconvenience which the defendant has caused him. Such recovery must be compensatory in nature, not punitive.

■■■ In determining what amount will reasonably compensate plaintiff for his injury, pain and suffering and inconvenience, the Court has considered the awards grant-

ed in similar cases.[3] Having done so, the Court concludes that plaintiff is entitled to recover $500,000 for non-economic damages.

### F. *Applicability of Nebraska Hospital–Medical Liability Act*

■ Based upon the Court's findings above, the plaintiff would be entitled to recover $1,292,738.00 from the defendant. Defendant argues, however, that plaintiff's recovery should be limited to $1,000,000.00 under the Nebraska Hospital–Medical Liability Act, Neb.Rev.Stat. § 44–2825.

The Federal Tort Claims Act provides that the government "shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances * * *." 28 U.S.C. § 2674. *Taylor v. United States,* 821 F.2d 1428, 1430 (9th Cir.1987), *cert. denied,* 485 U.S. 992, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988); *Lucas v. United States,* 807 F.2d 414 (5th Cir.1986). The Act also provides that liability is to be determined "in accordance with the law of the place where the [negligent] act or omission occurred." 28 U.S.C. § 1346. Because Louis' injury was incurred at Ehrling Bergquist Hospital on Offutt Air Force Base in Bellevue, Nebraska, the law of Nebraska applies to determine the extent of the government's liability.

Nebraska's Hospital–Medical Liability Act, § 44–2825(1), provides a cap on damages, stating, "The total amount recoverable under the Nebraska Hospital–Medical Liability Act from any and all health care providers * * * for any occurrence resulting in any injury or death of a patient may not exceed * * * one million dollars for any occurrence after December 31, 1984."

Plaintiff argues, however, that the Nebraska Hospital–Medical Liability Act does not limit the damage award in this case, because Ehrling Bergquist Regional Air Force Hospital failed to meet the state's requirements to be a qualified health care provider under the Act. Specifically, plaintiff asserts that defendant's hospital failed to file proof of financial responsibility, to pay surcharges levied by the excess liability fund, and to post notice of qualification under the Act, as required by Neb.Rev. Stat. § 44–2821(4) (Reissue 1988) and § 44–2824 (Supp.1990).

Plaintiff's argument is without merit. Other courts have rejected similar arguments with respect to the applicability of other state hospital-medical liability statutes in medical malpractice cases. For example, in *Taylor v. United States, supra,* 821 F.2d at 1431, the Ninth Circuit held:

> Other circuits considering this question have concluded that [state medical] liability limitations [statutes] * * * apply to the United States, even though the statutes purport to apply only to state-licensed health care providers. *See Lucas v. United States,* 807 F.2d 414, 417 (5th Cir.1986); *see also Scheib v. Florida Sanitarium and Benevolent Ass'n,* 759 F.2d 859, 863–64 (11th Cir.1985).

> \* \* \* \* \* \*

The only reason that Letterman Army Hospital and its staff are not licensed under California law is that California lacks power to require licensing of federal health care providers and physicians. The United States has, by virtue of the Supremacy Clause (Article VI, clause 2), essentially deemed [government hospitals] and [their] staff fit to provide health care services in California. To hold that [California's medical liability limitation statute] does not apply to the United States because the United States is exempt from state licensing requirements

---

**3.** *See e.g., Yako v. United States,* 891 F.2d 738 (9th Cir.1989) (awarding $1.3 million in non-economic damages); *Scott v. United States,* 884 F.2d 1280 (9th Cir.1989) (awarding $2,000,000 for non-economic damages); *Trevino v. United States,* 804 F.2d 1512 (9th Cir.1986), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987) (awarding $2,000,000 for non-economic damages); *Shaw v. United States,* 741 F.2d 1202 (9th Cir.1984) (reducing the district court's award for non-pecuniary damages from $5,000,000 to $1,000,000); *Nemmers v. United States,* 681 F.Supp. 567 (D.Ill.1988), *aff'd,* 870 F.2d 426 (7th Cir.1989) (awarding $400,000 for non-economic damages in light of the child's limited ability to comprehend); *Reilly v. United States,* 665 F.Supp. 976, 979 (D.R.I.1987), *rev'd in part on other grounds,* 863 F.2d 149 (1st Cir.1988) (awarding $1,000,000 for non-economic losses).

would contravene Congress' directive that the United States "shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. Accordingly, [California's medical liability limitation statute] applies to [plaintiff's] action against the United States for damages arising out of negligent treatment of her husband.

*Id.* at 1431–32 (citations omitted).

The Court is aware of no other federal caselaw holding to the contrary, nor has plaintiff cited any. Therefore, the Court must conclude that § 44–2825(1) of the Nebraska Hospital–Medical Liability Act limits the plaintiff's recovery to $1,000,000.00 in this action.

### G. *Periodic Payments*

As a final matter, the government proposes that the Court make plaintiff's award in the form of periodic payments in lieu of a lump sum payment. The government argues that in light of the speculative nature of plaintiff's actual life expectancy, plaintiff's condition, and his continued eligibility to receive CHAMPUS benefits, periodic structured payments could reduce the government's cost while at the same time fully compensating the plaintiff. The plaintiff has not offered a response to the government's proposal.

Having carefully considered the matter, the Court concludes that the damage award should be distributed in the form of a lump sum payment. An "award could in theory take the form of periodic payments, but in this country it has traditionally taken the form of a lump sum, paid at the conclusion of the litigation." *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 533, 103 S.Ct. 2541, 2548, 76 L.Ed.2d 768 (1983). The Court also notes that the First and Third Circuits have rejected periodic payments as a general matter. The Third Circuit has held that a court's authority to award damages for personal injuries is limited to making lump sum judgments 'unless and until Congress shall authorize a different type of award." *Frankel v. Heym,* 466 F.2d 1226, 1228–29 (3d Cir.1972). The First

Circuit has stated, "When a tortfeasor loses at trial, then—absent a statute or the parties' contrary agreement—it must pay the judgment in one fell swoop." *Reilly v. United States,* 863 F.2d 149, 170 (1st Cir. 1988) (footnote omitted). Based on these legal precedents, and in the absence of any showing that the government is otherwise entitled to a structured payment plan, the Court will order the damage award to be distributed in a lump sum.

### CONCLUSION

Based on the findings set forth above, judgment in the amount of $1,000,000.00, to be distributed in a lump sum, will be entered in favor of the plaintiff and against the defendant.